<u>Mario Sibug v. State of Maryland, No. 2, Sept. Term 2015, Opinion by Battaglia, J.</u>

**CRIMINAL LAW – COMPETENCY TO STAND TRIAL**

When a defendant previously has been declared incompetent to stand trial under Section 3-104 of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl. Vol), a court must make a determination upon retrial that the defendant is competent to stand trial.

Circuit Court for Baltimore County
Case No. K 99 – 05010 & K 99 – 1662
Argued: Sept. 2, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 2
September Term, 2015

MARIO SIBUG

v.

STATE OF MARYLAND

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T.,
     (Retired, Specially
          Assigned)

JJ.

Opinion by Battaglia, J.
Adkins and Watts, JJ., dissent

Filed: November 25, 2015

In the instant case,[1] we must address the quagmire that results from a defendant in a criminal case having been adjudicated incompetent, then eight years later being tried and convicted in the same case without having been adjudged competent to stand trial. [2]

We shall hold that the court erred by failing to make a judicial determination of Sibug's competency pursuant to Section 3-104 of the Criminal Procedure Article and also clearly erred, during sentencing, in finding Sibug competent to stand trial.[3]

---

[1] We granted certiorari in this case to consider the following questions:

1. Where a criminal defendant is found to be incompetent to stand trial, must a court find that the defendant has regained competence before he or she can be tried?
2. Did the trial court err in this case when it found Petitioner to be competent at sentencing without ordering a new competency evaluation or otherwise taking new evidence on the question of Petitioner's competency?

*Sibug v. State*, 441 Md. 217, 107 A.3d 1141 (2015).

[2] Sections 3-101 *et seq.* of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl. Vol.), address the issue of incompetency to stand trial in criminal and probation violation cases. All references herein to the Criminal Procedure Article are to the 2008 volume.

[3] Section 3-101(f) of the Criminal Procedure Article defines "[i]ncompetent to stand trial" as "not able: (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense," while Section 3-104 of the Criminal Procedure Article requires the court to determine competency:

> (a) If, before or during a trial, the defendant in a criminal case or a violation of probation proceeding appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial. (b) If, after receiving evidence, the court finds that the defendant is competent to stand trial, the trial shall begin as soon as practicable or, if already begun, shall continue. (c) At any time before final judgment, the court may reconsider the question of whether the defendant is incompetent to stand trial.

(continued . . . )

In 1999, in the Circuit Court for Baltimore County, Mario Sibug, Petitioner, was charged with three counts of first degree assault, two counts of second degree assault, three counts of reckless endangerment, one count of allowing minors access to a firearm and one count of the use of a gun in the commission of a crime of violence. The charges against Sibug arose from an incident in 1998, when, according to charging documents, Sibug pointed a handgun at his five children and threatened to kill them.

Prior to trial in 1999, Sibug entered pleas of not guilty, not competent to stand trial and not criminally responsible. The judge ordered that Sibug be examined by the Department of Health and Mental Hygiene to determine if he were "incompetent to stand trial pursuant to Health-General 12-101(d)."[4] After Sibug was evaluated at Clifton T. Perkins Hospital, the Department, in a letter to the court dated December 7, 1999, opined that Sibug was not competent to stand trial because of his "religious delusions" and inability to "separate man-made law from 'God's moral law'":

> The defendant is Not Competent to Stand Trial. The defendant demonstrated a factual understanding of the court system. However, his appreciation of the proceedings and his ability to assist in his own defense is significantly impaired by his psychosis. His religious delusions have led the defendant to believe that the judicial system and its agents are "of Satan." As a result, he believes he cannot receive a fair trial and he will not assist an attorney who does not have the same religious beliefs.

---

( . . . continued)
Under Section 3-106(b)(1) of the Criminal Procedure Article "the court may order the defendant committed to the facility that the Health Department designates until the court finds that: (i) the defendant no longer is incompetent to stand trial".

[4] Section 12-101(d) of the Health General Article, which contained the same provisions as does Section 3-101(f), was its precursor. Md. Code Ann., H-G § 12-101(d) (1982, 1990 Repl. Vol.).

The defendant does not accurately appreciate the proceedings against him. The defendant cannot separate man-made law from "God's moral law." Consequently, he does not believe that his situation is simply a criminal prosecution; but rather, a struggle between the "righteous" and the "wicked." This belief has impaired his ability to rationally weigh the advantages and the disadvantages of a plea bargain. He refuses to consider a plea bargain because "it would be succumbing to the forces of evil." He would rather be imprisoned for life or executed than betray his "righteous faith in the one true God." Furthermore, he intends to use a legal defense based upon Biblical scripture and "God's truth" rather than developing evidence to contest the facts of the case.

The defendant's alleged offenses were of a serious nature. His threats and behaviors indicate a significant potential for life threatening violence. This occurred in the setting of his displeasure with his children for lack of discipline. His recent onset of religious and paranoid delusions has intensified his negative feelings and thoughts toward his children. He now considers them "devils." Consequently, his risk for harming his children has intensified. The defendant is dangerous.

In January of 2000, the Circuit Court issued a "Finding of Incompetency and Order of Commitment" that stated:

Upon evidence presented that Mario Sibug is not able to understand the nature or object of the proceeding or to assist in the defense, this Court finds that Mario Sibug is presently incompetent to stand trial, and

Upon evidence presented that because of mental disorder, Mario Sibug is a danger to self of the person or property of others, it is

**ORDERED,** this 10th day of January, 2000, that Mario Sibug shall be committed to the Department of Health and Mental Hygiene for inpatient care and treatment until this Court is satisfied that Mario Sibug is no longer incompetent to stand trial or no longer is, because of mental retardation or mental disorder, a danger to self or the person or property of others.

Sibug remained at Perkins; by April, 2000, the Department had re-evaluated him and concluded that he was competent to stand trial because he was able "to distinguish between 'moral law' and 'man's law,'" although his "delusions" persisted:

Mario Sibug has a good understanding of the court system. He correctly identified the roles of the judge, jury, State's Attorney, and defense attorney. He offered that the three pleas available to him were guilty, not guilty, and not criminally responsible. The defendant also articulated an understanding of the concept of plea bargaining. In addition, the defendant correctly identified the charges against him and assessed them as "severe."

The defendant stated that it was his intention to plead not guilty. He stated that he would not plea bargain because he believed that it would be an admission of guilt for something he did not do. The defendant stated that he continues to believe that he is the "righteous one" in this case and that the complaining witnesses are "wicked." However, he recognized that despite this belief he could be found guilty and convicted. The defendant stated that he would be willing to accept that outcome if that was determined by the jury on interpretation of the facts of the case.

The defendant's previous beliefs on admission that the judicial system and its agents were "Satan" have resolved. The defendant currently demonstrates an ability to distinguish between "moral law" and "man's law." Moreover, the defendant no longer believes that he requires a Christian attorney in order to receive a fair trial since the outcome will be based on the evidence. The defendant demonstrated an understanding that the outcome of his case will be determined by a dispute over the facts. The defendant can now rationally weigh the advantages and disadvantages of various defenses. The defendant stated that he could work with a defense attorney who was ethical, hard working, and seriously interested in representing him.

The defendant continues to lack insight regarding past and present delusional beliefs and has remained unwilling to accept treatment. Despite this, the defendant's delusional beliefs no longer rise to the level of impairing his ability to understand the nature or object of the proceedings; or to assist in his defense. The defendant is competent to stand trial.

After the letter was docketed, trial was set for August of 2000.

On August 1, 2000, however, the Department sent another letter to the Circuit Court opining that Sibug's condition had deteriorated and that he was not competent to stand trial. Although a full evaluation was not attached, in a follow-up letter to the court

in October of 2000 the Department stated that "[g]iven his persisting delusions, his lack of insight, and emotional lability, Mr. Sibug is unable to understand the nature and the object of the proceedings against him":

> In his previous evaluation, Mr. Sibug was deemed competent to stand trial because he understood the nature and quality of the legal proceedings, and demonstrated the ability to assist a lawyer in his defense. In his most recent competency monitoring evaluation, however, his mental state showed a return of psychotic symptoms.
>
> Mr. Sibug demonstrated a basic understanding of the court system and the charges against him. He correctly identified the role of the judge, State's Attorney, defense attorney, and jury. He described Guilty, Not Guilty, and Not Criminally Responsible as available pleas. Further, he correctly listed the charges against him, and their severity. He understood the use of plea-bargaining to mitigate punishment.
>
> Despite his understanding of these abstractions, Mr. Sibug's religious and paranoid delusions prevented their application to his legal circumstances. For instance, he believed that his attorney was in league with his children and Satan. He stated that he was a "righteous man" like Noah, Abraham and Moses, and that these charges are meant to "test his faith in God," not to punish him for wrongdoing. He believed to plead Guilty or Not Criminally Responsible would result in rejecting God. When asked about his role in the alleged offenses, he answered with a litany of Biblical scriptures. When directed to answer in his own words, he became agitated and spewed forth more scripture.
>
> Given his persisting delusions, his lack of insight, and emotional lability, Mr. Sibug is unable to understand the nature and the object of the proceedings against him; he is unable to assist in his defense. His history of acting violently in response to these delusions makes him a high risk for dangerousness to self and to others.
>
> With full participation in treatment, Mr. Sibug is expected to achieve competency in the foreseeable future. His refusal to take medications is a major hurdle in the pathway to regaining competency to stand trial. Mr. Sibug would be expected to achieve competency once he becomes compliant with medications.

Thereafter, the Department periodically sent annual letters and evaluations to the Circuit Court indicating that Sibug remained incompetent.[5]

In 2003, the Department reflected that, "Sibug recently [has] been receiving medications involuntarily under a Clinical Review Panel and has improved with treatment" and "requested that the court make a determination regarding Mr. Sibug's competency to stand trial." The attached evaluation reaffirmed that:

> Mr. Sibug's past reported symptoms included paranoid thinking, hyperreligousity, and emotional lability. He denied having an illness. An ALJ hearing to determine if he could be medicated against his wishes was held in February, 2003. This hearing was the result of Mr. Sibug's appeal of the CTPMC Clinical Review Board's decision that Mr. Sibug be medicated against his wishes. The judge ruled that Mr. Sibug could be medicated. Olanzapine, an antipsychotic medication, was started at that time and was titrated to its current dosage of 15 mg by mouth per day.
>
> Mr. Sibug's symptoms of paranoia and emotional lability had improved since his last evaluation. Mr. Sibug agreed to meet with his attending physician voluntarily. He also agreed to meet with this evaluator for the first time. His willingness to meet with medical staff was a significant improvement in his treatment status. Mr. Sibug was willing to listen to rational arguments. In some instances he was agreed with what was presented to him. For example, when it was explained that his refusal to meet with me for competency monitoring evaluations based on his belief that "you were just like the others and would not be fair to me" was a rash decision not based totally on fact, Mr. Sibug was able to agree. In other areas, Mr. Sibug could understand the rationale of others, even though he continued to disagree. For example, Mr. Sibug felt that his doctors were trying to help him, despite the fact that he continued to deny that he was mentally ill. He did not think the staff was plotting against him or trying to

---

[5] The Department of Health and Mental Hygiene was required to report annually regarding those who had been adjudged incompetent: "In addition to any other report required under this title, the Health Department shall report annually to each court that has ordered commitment of a person under § 3–106 of this title." Md. Code Ann., Crim. Proc. § 3-108(a)(1) (2001).

violate his rights maliciously. He said, "They think everyone who get in here is mentally ill, so I can see why they think I am too."

Mr. Sibug understood the nature and object of the proceedings against him. He understood the roles of the judge, jury, State's Attorney, public defender and witnesses. He understood that the judge or jury would decide if he was innocent or guilty based on the different kinds of evidence presented at the trial. He felt that the judge or jury would try to be fair. He described the term plea bargain. He understood the pleas of guilty, not guilty, and NCR and understood the outcomes of each plea. He described proper courtroom behavior.

Mr. Sibug was able to demonstrate the capacity to assist in his own defense. Mr. Sibug, when presented with hypothetical situations was able to share his reasons for making specific choices. For example, Mr. Sibug indicated a preference to have a trial by jury. When presented with a rational and reasonable scenario where his attorney may suggest that a trial with only a judge might be in his best interest, Mr. Sibug said, "If he gave me a good reason like what you just described, I would agree with him and choose the judge over the jury." As Mr. Sibug felt he was not mentally ill, he was unwilling to entertain the NCR plea. Mr. Sibug was also adamant that he did not want to accept a plea agreement where he had to say he was guilty. Mr. Sibug understood that his attorney had to recommend these avenues if he thought they were in Mr. Sibug's best interest. Mr. Sibug said that if his lawyer recommended a plea bargain or NCR he understood that his attorney was trying to do what he thought was best. Mr. Sibug did not think his attorney was out to get him or otherwise against him. Mr. Sibug suggested that the problem he had was that his attorney might not be able to understand his religious and cultural beliefs, which would make it difficult for the attorney to understand why he might choose to go to court and "accept the risk" that he might end up in jail longer than if he accepted a plea bargain.

Mr. Sibug should continue to be offered medications. Efforts at developing a relationship with Mr. Sibug, which would enable him to work better with staff and continue to be more amenable to education regarding his condition and situation, should be continued.

The letter stated, "[e]nclosed, for your convenience, please find a draft order of competence. If this is acceptable to you, please execute it and request that the clerk's

office forward copies to all interested parties." The "Order of Competence," thereafter, though, was neither signed nor docketed by the court.

Later in 2003, the Department sent another letter to the Circuit Court stating that Sibug remained competent and requested "the court's determination regarding Mr. Sibug's competency to stand trial." Attached to the letter was the Department's evaluation, which stated:

> Mr. Sibug's clinical condition did not change significantly since his last competency assessment. He did not believe that he had a mental disorder. He did not believe that his mental condition changed during his hospitalization at Clifton. T. Perkins Hospital Center.
>
> He refused to discuss his clinical progress with staff. He did not believe that he benefitted from the psychotropic medication regimen. He stated that he planned to discontinue his psychotropic medication regimen upon discharge from Clifton T. Perkins Hospital Center. Inpatient treatment staff observed that his delusional symptoms persisted, manifested by paranoia and religious preoccupation. Staff observed limited improvement in some aspects of his clinical condition, for example, he was no longer hyperverbal, his religious preoccupation was less extreme, and he was less irritable.
>
> Mr. Sibug presented for the interview without overt evidence of psychotic symptoms. His thoughts were organized. He did not express suspicions or religious preoccupation. He was not irritable or restless. Mr. Sibug was able to control his behavior during the interview. He was able to focus on the issues raised in the interview with regard to his competency to stand trial. He was able to describe the criminal charges against him. He described alternative pleas and stated his intention to plead "not guilty" if he was allowed to stand trial. He would consider a plea bargain. He understood the roles of the courtroom participants. He believed that he could assist his defense attorney in his own legal defense.
>
> Mr. Sibug described past mistrust of his defense attorney when he was adjudicated incompetent to stand trial. He stated, "My public defender didn't tell me what I was not competent. I had to find out by reading my record." He stated that he did not know why his public defender allegedly did not inform him of his competency status. He stated that a social worker

later explained to him that "sometimes they have so many clients that they can't get in touch with everybody." He considered this explanation of the public defender's alleged failure to inform him of his competency status and said, "that's possible." When asked whether he could work with his public defender, given the past history of alleged miscommunication, he said, "I think so. We'll see."

Based on a review of the hospital record, discussion with inpatient staff, and this interview, Mr. Sibug was able to understand the nature and object of the proceedings against him. He was able to assist his counsel in the defense. Therefore, Mr. Sibug was competent to stand trial.

Another letter by the Department sent in January of 2004 iterated that, "Mr. Sibug was most recently evaluated for his competency to stand trial on November 13, 2003, and was assessed as competent":

The Clinical Review Panel was discontinued. [Sibug] took his medication voluntarily, but he did not believe that he received benefit from his psychotropic medication regimen. He stated, "I take the medicine so I can have my trial." He said that he did not plan to continue his medication after he was discharged from Clifton T. Perkins Hospital Center.

There was no evidence that Mr. Sibug's clinical condition changed significantly since his last competency assessment. He did not believe that his mental condition was changed since his admission to Clifton T. Perkins Hospital Center. He stated, "I don't believe I have a mental illness." He refused to discuss his clinical progress with inpatient staff. Treatment staff observed that his delusional symptoms persisted, manifested by religious preoccupation and paranoia. Staff observed limited improvement in some aspects of his clinical condition. For example, he was no longer hyperverbal, his religious preoccupation was less extreme. He was less anxious and irritable. He did not demonstrate assaultive behavior. His behavior occasionally appeared friendly. He participated in patient groups.

Mr. Sibug presented for the interview without overt evidence of delusions or hallucinations. His behavior was calm and cooperative throughout the interview. His thoughts were organized and concrete. He did not express suspicions or religious preoccupation. He was not irritable. He was able to focus on the issues raised in the interview with regard to his competency to stand trial.

Mr. Sibug described his criminal charges as, "The first one is first degree assault. That means hitting someone else. Next is parental abuse. That means you are abusing your children. And the last one is child endangerment. That means you put your children in danger." He was not sure about the penalties associated with his charges or his legal defense, but said, "I will have to discuss that with my attorney. But I've requested a new attorney." He described the available pleas as, "Guilty means they do the crime. Not guilty meant they didn't do the crime. And NCR means, they do the crime but because of mental illness, they aren't responsible." He described a plea bargain as, "The State will make a deal so there will not be a trial. There will be a lesser charge or sentence." He said that "The judge is neutral, and interprets and imposes the law." He said that, "The jury makes a verdict, and is also neutral." He said that, "The prosecutor proves that you committed the crime." He said that, "The witnesses tell their story for either side." He said that, "The defense attorney defends you." He stated, "My role is to tell the truth." He understood that he could not be forced to testify against himself, and added, "That's my constitutional right." He understood that his attorney could "cross examine" the prosecution witnesses. He said that a defendant in the courtroom must, "Pay attention and not be disruptive."

Mr. Sibug stated that he filed a grievance against his public defender with the "Attorney Grievance Commission." He said, "I'm not happy with my attorney. He's very controlling and domineering. He doesn't want to listen to anything I have to say. He wants to make all the decisions. But I think that I should be able to say what I think, also. It's my trial." He said that he requested a new public defender.

Based on a review of the hospital record, discussion with inpatient staff, and the present interview with Mr. Sibug, he was able to understand the nature and object of the proceedings against him. He was able to assist his counsel in his defense. Therefore, Mr. Sibug was competent to stand trial.

In May of 2004, when Sibug appeared in the Circuit Court, he proceeded by way of a not guilty statement of facts to the charge of second degree assault. During the proceedings, Sibug was informed of the implications of proceeding on an agreed statement of facts to which he indicated understanding. After being found guilty, Sibug

was sentenced to four and one-half years' imprisonment and was granted credit for the time he had spent in Perkins, which equated to the sentence of incarceration.

After his conviction, Sibug faced deportation to the Philippines. While in the custody of the Immigration and Nationalization Service, Sibug, *pro se*, filed a petition for writ of error coram nobis, alleging that he had not been advised of the effect a conviction for assault would have on his immigration status. In 2005, the Circuit Court determined that Sibug's counsel had been ineffective because he had not advised Sibug of the immigration consequences of his assault conviction, vacated Sibug's sentence and ordered a new trial.[6]

The retrial began in September, 2008 before the same judge who had presided over the coram nobis proceeding. During jury selection there was a conference at the bench, during which the circuit judge spoke briefly with Sibug, although the interaction between Sibug and the judge was limited.[7]

---

[6] At the coram nobis hearing the judge heard testimony from Sibug during which Sibug explained that he was concerned in his prior trial that he would be deported were he to plead guilty and only agreed to proceed on an agreed statement of facts after his lawyer assured him he would not be deported.

[7] [THE COURT]: Mr. Sibug, let me just tell you, whenever your attorney approaches the bench . . . you're entitled to be up here if you want to be up here.
[SIBUG]: I don't want.
[COURT]: You don't have to if you don't want to. You can stay at your seat but, if you want to come up, it's your decision.
[SIBUG]: Yeah. Thank you.

11

When Sibug took the stand,[8] he cited extensively to the Bible and expressed that he had held a gun on his children to test their faith during the incident in question:

[DEFENSE COUNSEL]: Now, on the evening you had an occasion to discipline [your children]?
[SIBUG]: Not really discipline them. I discipline them with the word of God just as stated, you know, in the Bible; especially, Hebrew 4:2, but on that time, as I said, I'm searching about the mustard grain of Jesus Christ. If they had a faith just like the size of a mustard grain.

* * *

[DEFENSE COUNSEL]: Did you pull a gun that night, Mr. Sibug?
[SIBUG]: It's not easy like that. Just, like, you know, every novel, you know, I tell, you know, a sermon alluding to the Bible. Just like Second Timothy 3:16 says, all Scripture is part of God for improving, for setting things straight and disciplining in righteousness, but they don't listen. I just want to get their attention.

* * *

[DEFENSE COUNSEL]: Tell the ladies and gentlemen how you went about trying to get their attention.
[SIBUG]: Yes. It's just like what Abraham did in Genesis:22:1-18. Abraham used a dagger but God tested his faith, and it make him subdued to his Father. Abraham were going to offer Isaac to Jehovah God. That's why in that chapter Abraham passed the test and from Abraham he set Jacob to marry and come out to Jesus Christ, your Savior, because of our sin.
[DEFENSE COUNSEL]: Now, were you testing the faith of your children?
[SIBUG]: Yes, sir.
[DEFENSE COUNSEL]: And will you tell the ladies and gentlemen specifically what you did to test their faith?
[SIBUG]: Yeah. I said, you know, if you will not listen to the Bible and also what I have said, I said I cannot let that go. Then I said, you know, just tell me the truth. Because they are always lying. Do you believe in God? Do you believe in the Bible? Because, if they had the sense of a mustard grain, then I let them go, but whether they did because one time I do like

---

[8] The record does not reflect any dialogue regarding Sibug's constitutional right to remain silent or testify between the judge and Sibug prior to Sibug's testimony; "[i]n Maryland, when a defendant is represented by counsel, there is no obligation on the part of the court to advise the defendant of the right to testify." *Savoy v. State*, 218 Md. App. 130, 148, 96 A.3d 842, 854 (2014) citing *Stevens v. State*, 232 Md. 33, 39, 192 A.2d 73, 77 (1963).

that, but I did not point anyone the gun to my children because my children they are nearest to my God. Solomon 157:3-5.

* * *

I remove, you know, the gun. I came from upstairs because I go back upstairs and pray. I said, you know, Jehovah, God, please help me. I'm in trouble. My children, they are rebellious. Then I come back; I said, you know how, you know, Abraham used the dagger, and I'm going to use the gun, and I put, you know, the empty bullet shells in the gun. I said, everyone, now, and then I said, you know, you call me names and everything. In this house there is authority I said and repeated and repeated. The head of the woman is the man. The head of the man is the Christ, and the head of Christ is God. 1 Cornelian 11:3. I said, why you don't respect authority? They never say anything and Mark is laughing. Gizele and Maria Lovely, they are, you know, they are - - I'm talking to them like this. They was facing in the wall just as usual. They are mocking me as father and then I did change all my bullets. I said, probably I'm going to offer you as sacrifice to my God, and the bullets fell down, all of them until the time there is no more left, and I put it on the table, and I pick up all the bullet shells from the table because they are not looking. Then I put them in my pocket. I pick up the live bullets in my left pocket and then put them over there. (Indicating.) I'm waiting for them. They look and they don't really care about me, but when they look at the gun and the bullets, then all of them cry. They are scared of the bullets, but they are not scared of my God and my Bible and me.

[DEFENSE COUNSEL]: Now, Mr. Sibug, why did you do that?

[SIBUG]: Well, as I said, sir, before they came in here they just using me as a stepping stone here. They don't love me. They hate me. They calling me names. I'm wife beater. I'm adulterer. My wife is a whore. Everything. And now, I'm Devil and my two children they are Devil. In front of me Mark is saying that one. I cannot touch him because I know the Devil is in him.

[DEFENSE COUNSEL]: Did you point a gun at Mark?

[SIBUG]: No. I point up in the ceiling. I did not – I'm sorry. You know, I did not mean, you know, to scare them, but you know, the other two kids and my wife and my father-in-law, they are not scared because they know. They know God and they are righteous, but my children, whatever the Bible said, they just refuse. They are wicked.

Sibug continued to allude to Biblical references on cross-examination:

[STATE'S ATTORNEY]: So it's all on your kids who were sort of considered as rebellious. They were all rebellious. They were all doing things that were not disciplined, right?

13

[SIBUG]: Sure. Only the three. The two, they are like human being but the three, they are goat like human being just like what Jesus Christ said in Matthew 25:31-46.

\* \* \*

[STATE'S ATTORNEY]: And when you brought [the gun] out and you had all of your kids around the table and you put it on the table, as you said, you did that as like a psychological strategy, right, to scare them?

[SIBUG]: Maybe in a sense because I'm a spiritual man and you are a disciple. A physical man cannot know the things about the spirit of God because everything is foolishness to him and then a spiritual man, you know, he examine everything but a man like you will never examine me. Corinthian 2:14-15.

[STATE'S ATTORNEY]: You felt it was okay to scare your kids by putting the gun in front of them, right?

[SIBUG]: No, sir. You are the one who said it. Don't put something in my mouth.

[STATE'S ATTORNEY]: I'm asking you a question.

[SIBUG]: No, sir. I just said, you know testing their faith.

\* \* \*

[STATE'S ATTORNEY]: Mark is the Devil, right, to you?

[SIBUG]: No, sir.

[STATE'S ATTORNEY]: He's not? You just said on direct examination that the Devil is in him.

[SIBUG]: Oh, yeah. Can I clarify that one, sir?

[STATE'S ATTORNEY]: I'm not asking you to clarify. That's what you said, right?

[SIBUG]: How can I explain it?

[STATE'S ATTORNEY]: I'm not asking you to do that.

[SIBUG]: Yeah. According to 1 John:3:10, he's not doing righteousness.

[STATE'S ATTORNEY]: You referred to him as Satan at one point?

[SIBUG]: Oh, yes because Satan is the Father of Lies. John 8:44.

[STATE'S ATTORNEY]: So did you feel then that it was okay to point a gun at him because he was the Devil?

[SIBUG]: No, sir. You are mistaken. You make me crazy. No, sir. No, sir.

[STATE'S ATTORNEY]: I have nothing further, Your Honor.

The jury found Sibug guilty of two counts of first-degree assault, two second-degree assault, one count of using a handgun in the commission of a crime of violence, and one count of giving minors access to a firearm as well as not guilty of one count of

14

first degree assault and three counts of reckless endangerment. At the end of the proceeding, the judge addressed Sibug:

> [THE COURT: Let me just advise you Mr. Sibug . . . all your other rights will accrue as of your date of sentencing.
> [SIBUG]: Yes, sir.

Prior to sentencing, weeks later, Sibug, through counsel, requested that the sentencing be delayed in order to accommodate a competency evaluation because "Defense attorney in retrospect believes that Mr. Sibug was incompetent to stand trial":[9]

> 2. That Mario Sibug's testimony and his lack of intelligent communications with his trial attorney indicate that Mr. Sibug was not competent to stand trial.

---

[9] The motion's certificate of service referenced "a motion for an appeal," which was docketed as correspondence but then treated as a motion for new trial, as the court explained at sentencing:
[THE COURT]: Upon reading it, I saw that the certificate of service states I hereby certify that on September 16th, 2008 a copy of the foregoing notice of appeal was delivered to the State's Attorney's Offices of Baltimore County. . . . So I told the clerk to redocket it as correspondence only . . . what I expected was once the defendant through counsel received this ruling redocketing it as correspondence only, that there may have been an attempt to refile a motion for new trial with the proper certificate. . . . [O]ut of an abundance of caution we could give the defendant a chance to file another motion for new trial and rule on it.
[DEFENSE COUNSEL]: I think the body of it would indicate what the intent was I would hope. I think it's a matter of putting it in the correct form, but the body would remain the same.
[THE COURT]: The allegation here is that Mr. Sibug's testimony and his lack of intelligent communication with the trial lawyer indicate Mr. Sibug was not competent to stand trial.
[DEFENSE COUNSEL]: That's correct.
* * *
[STATE'S ATTORNEY]: If that's the one issue, Judge, then I don't mind just – I mean, I think so we don't run into some issues further down the road, I don't mind addressing that one. . . .
[THE COURT]: All right. Then I will accept then what has been filed by the defendant as a motion for new trial, which was filed on or about September 17th, '08.

3. Mario Sibug has expressed the thought that "God's law is superior to man's law" which means that a man (a judge) has no jurisdiction in his case—a false belief, which in turn renders an alliance with his attorney problematic.

4. That Defense attorney in retrospect believes that Mr. Sibug was incompetent to stand trial.

WHEREFORE, Defense counsel requests that sentencing be held *sub curia* pending an evaluation on competency and criminal responsibility.

While the motion did not state that Sibug had been found incompetent in the same case, Sibug's counsel, at sentencing, stated that Sibug had been institutionalized:

He had put his faith as he still does in the Bible. As you saw him testify Your Honor, it was a little incoherent, to say the least, and I would like to really have him evaluated. I should have done this before, but I listened to my client. In retrospect after looking at the trial, having gone to trial and having witnessed him, I think that, if we would be granted a new trial to have him evaluated, it would be probably more – very beneficial for my client. He was evaluated before, Your Honor. He stayed five years, four and a half years in an institution being evaluated and their finding at the time was that he was competent and that he was not NCR.

The State, in response, argued at sentencing that, "he certainly quoted the Bible often, but his responses were rational. He was at times combative with me on cross-examination which shows he knew what was happening."

Ruling that Sibug was competent to stand trial, the judge examined the statutory requirements for a judicial determination of competency and gave Sibug's attorney an opportunity to present evidence:

[THE COURT]: The statute is kind of vague. 3-104 of the Criminal Procedure Article says if before or during a trial the defendant in a criminal case appears to the court to be incompetent to stand trial or the defendant alleges incompetency to stand trial, the court shall determine when evidence is presented on the record whether the defendant is incompetent to stand trial.

If after receiving evidence the court finds that the defendant is competent to stand trial, the trial shall begin as soon as practical or if

16

already begun, shall continue so there it indicates that if it appears to the court or the defendant alleges it has to be before or during trial.

[DEFENSE COUNSEL]: That's correct. I read that statute, and it has no language in there about a post trial motion such as I have made.

[THE COURT]: Except on the issue of reconsideration it says --

[DEFENSE COUNSEL]: Right.

[THE COURT]: -- under [subsection] (c) [of 3-104], at any time before final judgment and this would be before final judgment.

[DEFENSE COUNSEL]: Yes.

[THE COURT]: The court may reconsider the question of whether the defendant is incompetent to stand trial but that presupposes an initial consideration of the question, which wasn't raised before or during the trial. I guess it could be construed, as I look at it now, at any time before final judgment the court may reconsider the question of whether the defendant is incompetent to stand trial. I guess technically, since we're before judgment now, I could hold a hearing on that issue. Is that what you're asking for?

[DEFENSE COUNSEL]: Yes, Your Honor.

* * *

[DEFENSE COUNSEL]: I spoke to my client just now because, frankly, Your Honor, we have no evidence this morning to suggest competency or incompetency. I'm just basing this on my observation and my consistent contact with my client. Right now this morning at this moment my client is asking me to withdraw this motion. . . . [H]e wants to proceed here today so with that being said—

[THE COURT]: But as his attorney you want the court to pursue it?

[DEFENSE COUNSEL]: Yes, Your Honor.

[THE COURT]: Well, do you want to put on evidence?

[DEFENSE COUNSEL]: Well, Your Honor, the kind of evidence—that's the problem. I'm not prepared because I'm not an expert. If I were to put on any evidence, it would be the medical information that was already done where he was found competent, but I do know this much, Your Honor. I know that competency is a shifting standard. You could be competent today and incompetent tomorrow but I'm not prepared to put that on. I would have to call doctors. I would have to have him evaluated, and I would need a psychologist or psychiatrist to come in and tell the court if he is he is, in fact, incompetent or at that time that we went to trial. Now, my client has indicated to me, as I said to the court, that he wants to proceed today.

[SIBUG]: Yes.

[DEFENSE COUNSEL]: He has that right so with that being said, Your Honor, I think we're ready to go forward here today because not to go forward—I don't want—he's adamant about this as he has been all along.

[THE COURT]: Okay. All right. So you have no additional evidence to put forth?

17

[DEFENSE COUNSEL]: No, I do not, Your Honor.

[THE COURT]: All right. Well, based on the record that I have which consists of the 2004 evaluation from the [Department] finding Mr. Sibug competent to stand trial and the fact that it appeared to me during trial that he was able to communicate with his defense attorney. The trial lasted some time. Didn't it last a couple days?

[DEFENSE COUNSEL]: Yes, it did, Your Honor. I believe that trial lasted two days.

[THE COURT]: All right. Two days. I observed him communicating with counsel. I observed him engage in the voir dire process. He seemed to understand exactly what was going on. I do believe that his rejection of the plea offer, even accepting [defense counsel's] statement that it was a slim chance of deportation, there's still a chance of it even with that plea agreement and he rejected it. So based on everything that I recall, based on the evidence in this hearing, which is actually no additional evidence, I believe he did understand the nature of the proceedings against him, and he was able to assist in his own defense and so I find that he's competent. . . . I find based on the totality of the facts and circumstances beyond a reasonable doubt he was competent to stand trial.

Prior to sentencing, the court addressed Sibug regarding the right of allocution, and Sibug provided a letter he wanted read and more Biblical references:

[THE COURT]: Mr. Sibug you have a right of allocution. That means you have a right to tell me anything you want me to know about.

[SIBUG]: Thank you very much, Your Honor.

[THE COURT]: Stand up a minute.

[SIBUG]: Thank you very much, Your Honor.

[THE COURT]: You're free to remain silent if you wish. You're free to remain silent if you wish.

[SIBUG]: No, sir. I must, you know, tell you truthful messages to the honorable court, and I would like to use my rights and freedom of speech granted by the First Amendment of the United States constitution. I would like to read my message.

[THE COURT]: If you want to read something, why don't you just hand it up to me? I can read it. I can read what you wrote.

[SIBUG]: I would like to read it so that everyone would hear it.

THE COURT]: How long is it?

[SIBUG]: Only seven pages.

[THE COURT]: I can read it.

[SIBUG]: No, sir.

[DEFENSE COUNSEL]: Let the judge read it.

18

[SIBUG]: I need –

[THE COURT]: If you're just going to read it, I don't need you to read it.

[SIBUG]: Okay. Please read it.

[THE COURT]: Is there anything you want to tell me besides what's in there?

[SIBUG]: No. Please read it, sir.

[THE COURT]: Thank you, sir. Liz, have this marked as Defendant's Exhibit Sentencing Hearing Exhibit.

[THE CLERK]: All right.

(Whereupon, Defendant's Sentencing Exhibit No. 1, Defendant's letter, was marked as Defendant's Sentencing Exhibit No. 1.)

[THE COURT]: Okay. I have read it. Thank you, Mr. Sibug. Anything else you want to tell me?

[SIBUG]: Yes, Your Honor. I just want to say on the record that's all I want and then whatever you going to do to me, do it just like what is written. If I live, if I die, I belong to Jesus, God. Romans 14:8.

[THE COURT]: Thank you, sir. All right. . . . So, essentially, if you put it altogether, it's really a ten year sentence with credit for time served, including that time committed to the State Department of Health and Mental Hygiene. Okay? [Defense counsel], you want to advise your client?

[DEFENSE COUNSEL]: Yes. Mr. Sibug, you have 90 days to ask the court to modify the sentence. You have 30 days to file an appeal to the Court of Special Appeals. . . . Okay?

[SIBUG]: Yeah. I would like to note an appeal, everything, and I want a copy of that, you know, letter that has not been read in the court of law.

The letter, seven pages in total, stated in part:

I did not violate any laws in the State of Maryland; I simply obeyed Jehovah God just like my Forefather Abraham (See Genesis 22:1-18); But I was convicted already as a Criminal by Man's law in the Baltimore County Circus Court. "Apostle Peter and John said Whether it is righteous in the sight of God to listen to you, rather than to God, judge for yourself" (Acts 4:19). Jesus Christ said: "Stop judging that you may not be judged; for what judgement you are judging you will be judged." (Matthew 7:1, 2).

Jesus Christ said: "I am not part of the world." My case is a God thing and not a Caesar thing. I must be judged by Jehovah's Perfect law and not by the laws of the State of Maryland. Therefore, the Baltimore County Circus Court has no jurisdiction in my Case, simply because it is a God thing. God said: "Search for what is Good and not what is Bad, to the end that you people may keep living and that thus Jehovah the God of Armies may come to be with you, just as you have said: Hate what is bad, and love what is good, and give justice a place in the gate." (Amos 5:14, 15).

19

After the court sentenced Sibug to ten years' imprisonment, Sibug filed his own petition for post-conviction relief; with the consent of the State, the Circuit Court entered an order granting Sibug the right to file a belated notice of appeal.

Sibug appealed and presented two questions to the Court of Special Appeals:

I. Was Sibug's right to due process of law violated by the court's failure to determine, prior to his new trial, that he was competent to stand trial?
II. Did the trial court err in finding, at the sentencing hearing following Sibug's new trial, that he was competent to stand trial?

*Sibug v. State*, 219 Md. App. 358, 362 (2014). In affirming Sibug's conviction, our intermediate appellate court reasoned that there was no need for the Circuit Court to determine competency because the issue was not raised prior to or during his new trial in 2008:

> Given that the reversal of a conviction "with an order for a new trial, 'wipe[s] the slate clean,' and the case [begins] anew procedurally," returning the case to the stage where "any pretrial motions could be filed and resolved," *Hammersla v. State*, 184 Md.App. 295, 313–14, 965 A.2d 912 (2009), it was incumbent upon Sibug, or his counsel, to raise the issue of incompetency anew. *Cf. Harrod v. State*, 423 Md. 24, 34–36, 31 A.3d 173 (2011) (explaining that the grant of a mistrial, like the grant of a new trial, "requires the litigants to observe pretrial procedures once again," including the State's obligation to give notice of its intent to introduce a chemist's report even though the same report had been introduced at the first trial); *Marshall v. State*, 213 Md.App. 532, 550–54, 74 A.3d 831 (2013) (concluding that the grant of a new trial "effectively wipe[d] out the prior proceedings" and required the defendant to allege at his second trial that the Maryland gang statute was unconstitutional even though he had raised that same issue prior to his first trial).

*Id.* at 370, 100 A.3d at 1252.

In reaching its decision, the Court of Special Appeals noted that "no appellate decision has stated that a defendant's incompetence to stand trial must be raised anew," but reasoned that *Gregg v. State*, 377 Md. 515, 833 A.2d 1040 (2003) suggested that result:

> In that case, the District Court of Maryland ordered a competency evaluation of John Leon Gregg, who was charged with second-degree assault. At the competency hearing that followed, the district court—after reviewing the report prepared by the facility where Gregg had been evaluated, hearing testimony from one of Gregg's evaluators, and questioning Gregg directly—found Gregg competent to stand trial. Gregg subsequently prayed a jury trial and the case was transferred to the circuit court, where Gregg was tried by a jury and found guilty. He thereafter noted an appeal, contending that the circuit court had a duty to inquire into his competence to stand trial and had erred in failing to do so.
>
> The Court of Appeals explained that, when Gregg's case was removed to the circuit court, "the proceedings properly began anew," and the circuit court was not bound by the district court's ruling on "pre-trial matters," including any prior determination of Gregg's competence. Since the circuit court trial was a "separate and distinct" proceeding from the district court trial, the issue of Gregg's competence to stand trial had to be "raised anew in the Circuit Court proceedings," according to the Court of Appeals, "in order to compel the need for a competency determination." Because that issue was not raised anew in the circuit court, and because Gregg's behavior at trial did not trigger any obligation of that court to evaluate his competence *sua sponte*, the issue of Gregg's competency "was not properly before the court," said the Court of Appeals, and thus the circuit court did not err in failing to address it. As Gregg's circuit court trial was "separate and distinct" from the preceding district court proceeding, so too was Sibug's new trial "separate and distinct" from his first trial. It, in effect, "wiped the slate clean."

*Id.* at 370-71, 100 A.3d at 1252-53 (internal citations omitted.

Because the issue of Sibug's competency was not raised pre-trial, the Court of Special Appeals asserted that, "the 'only way' in which the question of competency could have been placed before the circuit court was if Sibug 'appear[ed] to the court to be

21

incompetent to stand trial,' triggering the court's '*sua sponte* duty' to evaluate his competence." *Id.* at 372, 100 A.3d at 1253, citing *Gregg*, 377 Md. at 545, 833 A.2d at 1058. In assessing what the judge did, our intermediate appellate court relied upon the fact that, "[t]he circuit court, in finding at sentencing that Sibug was competent to stand trial, recalled its observations of Sibug during the trial and concluded that Sibug 'seemed to understand exactly what was going on' during the proceedings. The court's conclusion is supported by the record." *Id.* at 372, 100 A.3d at 1253. Thus, "[a]t no time during trial did it appear from the transcript of that proceeding that Sibug did not have the ability to work with his lawyer and to assist in his own defense." *Id.*

We disagree.

Our statutory framework addressing capacity to stand trial can be traced back to at least 1826 with the enactment of Chapter 197 of the Maryland Laws, entitled "An Act relating to Lunatic and Insane Persons." The Act provided that, "where any person shall be indicted for a crime or misdemeanor, and such person sets up, or alleges insanity or lunacy" a jury would determine if "such person was, at the time of the commission of such offence, or still is, insane, lunatic or otherwise." 1826 Md. Laws, Chapter 197. If the jury were to find that the person "was, at the time of committing the offence, and then is, insane or lunatic" the court was mandated to commit the person "until such person shall have recovered his reason, and be discharged by due course of law." *Id.* Section 2 of the Act provided for a similar procedure if the person had not yet been indicted:

> That where any person shall be arrested . . . or is charged with any crime, offence or misdemeanor, and who appears to the court, or is alleged to be lunatic or insane, and against whom there is no indictment, it shall be the

22

> duty of the [court] to cause a jury . . . to be empannelled forthwith, and to charge said jury to inquire whether such person was, at the time of the commission of the act complained of, insane or lunatic, and still is so[.]

*Id.*

The conflation of insanity, sometimes referred to as "insanity then," and incompetency, referred to as "insanity now," remained our law until 1967.[10] In *Rowe v.*

---

[10] The Act was originally codified in the first Maryland Code, the Code of 1860, as Sections 4-6 of Article 58. Md. Code (1860), Art. 58 §§ 4-6. When the Legislature adopted a new code in 1888 to replace the Code of 1860, the provisions were recodified, without amendment, in Sections 4-6 of Article 59. Md. Code (1888), Art. 59 §§ 4-6. Section 5 was amended by Chapter 465 of the Maryland Laws of 1898, although the revisions are not relevant here.

Sections 4 and 6 of Article 59 also were amended by Chapter 699 of the Maryland Laws of 1916 to allow the court to order a psychiatric examination of the defendant upon a plea of insanity. Section 4 provided that "[t]he judge of the court . . . shall have full power and authority at any time before trial to order an examination of the mental condition of [an indicted] person by the lunacy commission". 1916 Md. Laws, Chap. 699. Section 6 provided:

> if the court shall have any reason to suspect that [a charged] person may be a lunatic or insane the court may cause the lunacy commission to inquire whether such person is at the time of such inquiry insane or lunatic, or of such mental incapacity as to prevent such person from properly conducting his or her defense or advising as to the conduct of his or her defense; and if the lunacy commission shall find the such person is at the time of such inquiry insane or lunatic or of such mental incapacity as to prevent such person from properly conducting his or her defense or advising as to the conduct of his or her defense, the court shall in its discretion direct such person to be confined in one of the institutions referred to in the preceding section, until he or she shall have recovered and shall stay the proceedings against such person until that time, and upon recovery the court shall proceed with the trial of the charge pending against such person.

*Id.*

In 1916, two sections were added to the beginning of Article 59 and Sections 4-6 were renumbered, without change, as Sections 6-8. 1916 Md. Laws, Chap. 566. By Chapter 436 of the Maryland Laws of 1931, Section 6 was amended so that a person could enter a plea of insanity at the time of the crime "and/or" insanity at the time of trial. During a Special Session in 1933 Section 6 was amended again to read:

(continued . . . )

*State*, 234 Md. 295, 199 A.2d 785 (1964), one consequence of that conflation was the subject of our review.

In *Rowe*, the jury had determined that Rowe "was insane at the time of trial ('insane *now*') in addition to also finding that he was sane at the time of the offense ('sane *then*')" and also decided that Rowe was "'not guilty of murder in the first degree but guilty of murder in the second degree.'" *Id.* at 297, 199 A.2d at 786. The trial court did not commit Rowe to a mental institution but "sentenced him to the penitentiary for a term of eighteen years". *Id.* at 301, 199 A.2d at 788. Rowe appealed and we reversed, concluding that, "[e]ven though a question as to the failure of the trial court to advise the jury with respect to not returning a verdict on the indictment in the event of a finding of insane *now* was not included in the assignment of errors, we think we must, under the unusual circumstances of this case, take cognizance of the plain error *sua sponte*."[11] *Id.* at 302, 199 A.2d 789.

---

( . . . continued)
> When it is desired to interpose the defense of insanity or lunacy on behalf of one charged with a crime, offense or misdemeanor, the defendant, his or her counsel, or other person authorized by law to appear and act for him or her, shall, at the time of pleading to the indictment or information, unless the court for good cause shown shall otherwise order, file a plea in writing, in addition to the plea or pleas required or permitted by law, alleging that the defendant was insane or lunatic at the time of the commission of the alleged crime, offense or misdemeanor, and/or that the defendant is insane or lunatic at the time of the trial.

1933 Md. Spec. Sess. Laws, Chap. 81. Sections 6-8 of Article 59 were renumbered, without change, as Sections 7-9 following the enactment of Chapter 539 of the Maryland Laws of 1953.

[11] The "assignment of errors" presented on appeal were:

(continued . . . )

In reversing Rowe's conviction, we posited that the purpose of our statute governing insanity was "to prevent an accused who is mentally incapable of forming a criminal intent from being tried until he has recovered his reason and to protect him from being punished for an offense as if he were sane" and that the purpose "remained substantially the same as when §§ 7 and 9 were originally enacted as §§ 1 and 2 of Chapter 197 of the Laws of 1826." *Id.* at 302-03, 199 A.2d at 789. We characterized our statute, unlike some other states' statutes, as referring only to "finding sanity or insanity *then* or *now*." *Id.* at 304-05, 199 A.2d at 790. We concluded that, "the trial court should not have received a verdict on the issue of guilt or innocence when the jury at the same time had found on the issues of insanity that the defendant was 'insane' at the time of trial." *Id.* at 306, 199 A.2d at 791. We reasoned that, "[o]n the contrary, it was the duty of the court to refuse to receive the verdict of second degree murder which the jury was without power to render under the circumstances." *Id.* at 307, 199 A.2d 791-92. We suggested the statute required revision to avoid such consequences:

> Unfortunately those parts of the insanity statutes providing for the filing of pleas of insane *then* and insane *now*-the purpose of which is to determine the responsibility of an accused for his alleged unlawful or criminal acts and his capacity to defend himself at a trial therefor-and *especially the effect* of a finding of insane *now*, have not been clearly and certainly

( . . . continued)
> (i) whether the evidence produced at the trial was legally sufficient for the jury to have found beyond a reasonable doubt and to a moral certainty that the defendant was sane at the time of the offense; (ii) whether the defendant was denied a speedy trial; and (iii) whether it was illegal, inconsistent or an abuse of discretion to sentence the defendant to the statutory maximum period to run from the date of sentencing.

*Id.* at 301, 199 A.2d at 788.

25

defined and delineated. At least two sections of the law have been amended from time to time without clearly expressing in their changed form how one section affects the other or how the amended sections affect other sections of the law that were not changed. As a consequence it is difficult, if not impossible, to state with clarity and precision what the Legislature had in mind when the statutes were enacted. Hence, it would seem peculiarly appropriate for the Legislature to clarify all aspects of the insanity statutes relating to criminal offenses.

*Id.* at 309-10, 199 A.2d at 793.[12]

The issue of legislative reform gained immediacy when, in 1966, the Supreme Court of the United States determined that constitutional considerations regarding due process required a court to hold a hearing on competency to stand trial, when a defendant's competency was in doubt. In *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966), Robinson was convicted of murder, although his counsel had claimed Robinson was insane at the time of the murder and raised the issue of Robinson's competency to stand trial. Without holding a hearing, however, the trial court had rejected these contentions and Robinson was convicted. *Id.* at 376, 86 S. Ct. at 837, 15 L. Ed. 2d at 815. The Supreme Court of Illinois affirmed, determining that "no hearing on mental capacity to stand trial had been requested, that the evidence failed to raise sufficient doubt as to his competence to require the trial court to conduct a hearing on its own motion, and further that the evidence did not raise a 'reasonable doubt' as to his sanity at the time of the offense." *Id.* at 376, 86 S. Ct. 837, 15 L. Ed. 2d at 815. Robinson

---

[12] The dissent in *Rowe*, authored by Judge William L. Henderson, joined by Chief Judge Frederick Brune and Judge Hall Hammond, iterated the need for revision. *Id.* at 310, 199 A.2d at 793 (Henderson, J. dissenting).

then filed a federal habeas corpus petition, which was denied. *Id.* at 377, 86 S. Ct. at 837-38, 15 L. Ed. 2d at 815. The Court of Appeals for the Seventh Circuit, however, reversed "on the ground that Robinson was convicted in an unduly hurried trial without a fair opportunity to obtain expert psychiatric testimony, and without sufficient development of the facts on the issues of Robinson's insanity when he committed the homicide and his present incompetence."[13] *Id.* at 377, 86 S. Ct. at 838, 15 L. Ed. 2d at 815.

The Supreme Court affirmed, concluding "Robinson was constitutionally entitled to a hearing on the issue of his competence to stand trial." *Id.* at 377, 86 S. Ct. at 838, 15 L. Ed. 2d at 815-16. The Court emphasized that the conviction of a legally incompetent person "violates due process and that state procedures must be adequate to protect this right" and reasoned "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." *Id.* at 385-86, 86 S. Ct. at 841, 15 L. Ed. 2d at 822.

The gravamen of the case was that the failure to hold a hearing on the issue of Robinson's competency was a deprivation of the "constitutional right to a fair trial" such that, "[w]here the evidence raises a '*bona fide* doubt' as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing pursuant to Ill. Rev. Stat., c. 38, § 104—2 (1963)." *Id.* at 385, 86 S. Ct. at 842, 15 L. Ed. 2d at 822. In language prescient to the instant situation, the Supreme Court noted that "mental alertness and understanding" at trial "offer[ed] no justification for ignoring the

---

[13] Prior to the habeas corpus proceedings, the Supreme Court of the United States had denied certiorari. 368 U.S. 995, 82 S. Ct. 618, 7 L. Ed. 2d 533 (1962).

uncontradicted testimony of Robinson's history of pronounced irrational behavior" and, therefore, "Robinson's constitutional rights were abridged by his failure to receive an adequate hearing on his competence to stand trial". *Id.* at 385-86, 86 S. Ct. at 842, 15 L. Ed. 2d at 822.

After *Pate*, the State of Maryland Commission on Criminal Law, otherwise known as the Brune Commission, and the Legislative Council of Maryland proposed changes to Article 59 to bifurcate consideration of insanity then and insanity now.[14] In 1967, the Legislature did separate insanity then from insanity now such that a judicial determination of incompetency to stand trial would depend on "whether such person is unable to understand the nature or the object of the proceeding against him or to assist in his defense":

> Whenever prior to or during the trial, any person charged with the commission of any crime shall appear to the court, or be alleged to be incompetent to stand trial, by the defendant himself, the court shall determine upon testimony and evidence presented on the record whether such person is unable to understand the nature or the object of the proceeding against him or to assist in his defense.

---

[14] *See* Legislative Council of Maryland, *Report to the General Assembly of 1967,* 135-39; Maryland Commission to Prepare Substantive Changes, As Necessary, in the Mental Health Laws, *Report of the Commission*, 36-37 (1968) ("This bill recommended by the Legislative Council is a result of the joint work of the Crimes Subcommittee of the Council and a Subcommittee of the Governor's Study Commission on Criminal Laws. The bill defines the tests for the criminal defenses of both insanity at the time of the commission of an offense and insanity at the time of trial. It also specifies certain procedures in connection with the defenses."); State of Maryland Commission on Criminal Law, *Report and Part I of Proposed Criminal Code,* vi-vii (1972); *see also Sangster v. State*, 312 Md. 560, 571-73, 541 A.2d 637, 642 (1988) (examining the legislative history of the statute).

1967 Maryland Laws, Chapter 709. Competency could be raised again, even after a determination of competency had been made:

> If the court after receiving testimony and evidence determines that the defendant is competent to stand trial within the meaning of this section, the trial shall commence as soon as practicable, or if already commenced, shall continue. The court may in its discretion at any time during the trial and until the verdict is rendered, reconsider the question of the competency of the defendant to stand trial as otherwise provided in this section.

1967 Maryland Laws, Chapter 709. If the defendant were determined to be a danger to himself, or the community, the court could commit him to the care of the Department of Mental Hygiene:

> If the court determines that the defendant is by reason of mental disease or defect, a danger to himself or to the safety of the person or property of others, it may in its discretion order the defendant sent to a hospital or mental institution, public, corporate, or private designated by the Department until such time as the court is satisfied that the defendant is competent to stand trial or has ceased to be by reason of mental disease or defect a danger to himself or to the safety of the person or property of others.

1967 Maryland Laws, Chapter 709.

In 2001, the Legislature added the Criminal Procedure Article to the Maryland Code, pursuant to Chapter 10 of the Maryland Laws of 2001; the provisions pertaining to competency were recodified as Sections 3-101 *et seq.* of that Article, Maryland Code (2001). [15] Now, Section 3-101(f) of the Criminal Procedure Article, Maryland Code

---

[15] In 1970, Chapter 407 of the Maryland Laws repealed Article 59 of the Maryland Code (1957, 1968 Repl.Vol., 1969 Supp.) in its entirety, removing the name "Lunatics and Insane" from the title and renaming the Article, "Mental Hygiene." Sections 7 and 8 were renumbered as Sections 23 and 24, respectively, but remained substantially the same. When the Health-General Article was enacted by Chapter 21 of the Maryland Laws of

(continued . . . )

(2001, 2008 Repl. Vol.), defines "[i]ncompetent to stand trial" as "not able: (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense."

Section 3-104 requires the court to determine competency *sua sponte* or if raised:

> (a) If, before or during a trial, the defendant in a criminal case or a violation of probation proceeding appears to the court to be incompetent to stand trial

---

( . . . continued)
1982, Sections 7 and 8 of Article 59 were recodified without substantial change as Sections 12-101 *et seq.* of the Health-General Article, Maryland Code (1982). Section 12-101(c) of the Health-General Article provided that "'incompetent to stand trial' means not able: (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense." Specifically Section 12-102 of the Health-General Article provided:

> (a) *Hearing*. If, before or during a trial, the defendant in a criminal case appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial.
> (b) *Court action if defendant competent*. If, after receiving evidence, the court finds that the defendant is competent to stand trial, the trial shall begin as soon as practicable or, if already begun, shall continue.
> (c) *Reconsideration of competency*. At any time during the trial and before verdict, the court may reconsider the question of whether the defendant is incompetent to stand trial.

Section 12-104(b)(1) of the Health-General Article provided for the commitment of a defendant found incompetent:

> If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to the defendant or the person or property of another, the court may order the defendant sent to the facility that the Department designates until the court is satisfied that the defendant no longer is incompetent to stand trial or no longer is, because of mental retardation or a mental disorder, a danger to the defendant or the person or property of another.

In 1984, the Health–General Article was again amended by Chapter 501 of the Maryland Laws of 1984 and Sections 12-101(c), 12–102 and 12-104(b)(1) of the Health–General Article were renumbered as Sections 12-101(d), 12–103 and 12-105(b)(1), respectively. Additionally, minor changes to the relevant provisions were made by Chapter 353 of the Maryland Laws of 2006. Section 3-104(c) was changed to allow a reconsideration of competency "before final judgment" rather than "before the verdict." 2006 Md. Laws, Chap. 353. Section 3-106 was changed to substitute "until the court finds" for the previous language of "until the court is satisfied." *Id.*

or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial. (b) If, after receiving evidence, the court finds that the defendant is competent to stand trial, the trial shall begin as soon as practicable or, if already begun, shall continue. (c) At any time before final judgment, the court may reconsider the question of whether the defendant is incompetent to stand trial.

Section 3-106(b)(1) allows the court to commit a defendant found not competent to stand trial and dangerous until the court finds that the defendant is no longer incompetent, or no longer dangerous, or not likely to recover:

> If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to self or the person or property of another, the court may order the defendant committed to the facility that the Health Department designates until the court finds that: (i) the defendant no longer is incompetent to stand trial; (ii) the defendant no longer is, because of mental retardation or a mental disorder, a danger to self or the person or property of others; or (iii) there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future.

In *Raithel v. State*, 280 Md. 291, 298, 372 A.2d 1069, 1073 (1977) we recognized that our standard for competency mirrored that of the federal courts and emphasized its due process underpinnings:

> The Maryland test for competency adopted in 1967, now contained in Art. 59, § 23, tracks in virtually identical language the federal standard— whether the accused is "so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense." 18 U.S.C. § 4244 (1970). In *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam), the Supreme Court, in explicating the federal test, enunciated what has since been widely quoted as the *Dusky* rule:
>> ". . . whether [the accused] has sufficient present ability to *consult* with his lawyer with a *reasonable degree of rational understanding*- and whether he has a rational as well as factual understanding of the proceedings against him." Id. (emphasis added).

31

> Although *Dusky* represents the federal test, we remain mindful that the common law prohibition against trying an incompetent defendant, now embodied in both the federal and Maryland statutes, 'is fundamental to an adversary system of justice.' *Drope v. Missouri*, 420 U.S. at 172, 95 S. Ct. at 904.

We have also stated that, "it is strikingly obvious that the Legislature envisioned a need for a Court determination of competency and required that, in Maryland, such a determination generally can be accomplished through a hearing on the issue of competency." *Roberts v. State*, 361 Md. 346, 363-64, 761 A.2d 885, 894-95 (2000). Such a determination can only be made after "an opportunity for evidence to be presented" on the record and the determination "is to be held to a standard of beyond a reasonable doubt." *Id.* at 366, 761 A.2d at 896. In *Roberts* we held "that when a defendant makes an allegation of incompetency to stand trial and there is *no evidence in the record* as to the defendant's incompetency to stand trial, as opposed to a proffer, an accused must be afforded an opportunity to present evidence upon which a valid determination can be made." *Id.* at 356, 761 A.2d at 891 (emphasis in original).

In the present case, the State alleges that Sibug's claim regarding the needed determination of competency was not "preserved," so that it was Sibug's burden to raise the issue of competency "anew," relying on *Gregg*, 377 Md. 515, 518, 833 A.2d 1040, 1042 (2003), in which we held that a district court's determination that the defendant was competent did not trigger the circuit court's *sua sponte* duty to evaluate competency when the case was transferred from the district court to the circuit court. *Sibug*, 219 Md. App. at 374, 100 A.3d at 1254. In *Gregg*, the district court had ordered a competency evaluation of Gregg, in which the Department of Health and Mental Hygiene opined that

32

Gregg was not competent to stand trial. Subsequently, a competency hearing was held in which the district court judge questioned Gregg and heard testimony from one of the evaluators who opined that Gregg was then competent to stand trial. Based on the evidence, the district court judge determined Gregg was competent.

After Gregg requested a jury trial, the case was transferred to the circuit court. The circuit court did not inquire into Gregg's competency and Gregg was convicted. We concluded that the district court's findings did not require the circuit court to examine the defendant's competency *sua sponte* "because that issue was not properly before the court." 377 Md. at 543, 833 A.2d at 1056-57.

We reasoned that, "[w]hen a criminal defendant prior to trial in the District Court requests a jury trial, the District Court is divested of its jurisdiction and jurisdiction is then conferred on the circuit court." *Id.* at 542, 833 A.2d at 1056. Thus, the "District Court proceedings conducted to that point were not binding on the circuit court," and the case began "anew." *Id.* We reasoned that under Section 3-101(c) of the Criminal Procedure Article, Maryland Code (2001) "the 'court' is defined as 'a court that has criminal jurisdiction.'" *Id.* at 543, 833 A.2d at 1056. Thus, "[w]hen the Circuit Court obtained jurisdiction over Gregg it was not bound by the prior determination of competency made by the District Court and the proceedings properly began anew without any competency determination on the Circuit Court record." *Id.*

The situation in *Gregg* is inapposite to the situation which presents itself in the instant matter. In the present case, we have one case in one circuit court, albeit with a

33

circuitous history. The Circuit Court's jurisdiction continued throughout the case without divestment.[16]

In addition to *Gregg*, with respect to the issue beginning "afresh" because of a retrial, the Court of Special Appeals and the State, relied on *Hammersla v. State*, 184 Md. App. 295, 905 A.2d 912 (2009) and *Harrod v. State*, 423 Md. 24, 31 A.3d 173 (2011) for the proposition that the grant of a new trial "wiped the slate clean" such that the issue of competency must have been raised "afresh." In *Hammersla* the State sought an enhanced penalty of life without the possibility of parole after having advised Hammersla of its intent, as required under Section 2-203 of the Criminal Law Article.[17] Hammersla's conviction was reversed by the Court of Special Appeals, and a new trial was ordered. 184 Md. App. at 309, 905 A.2d at 920. Notice of the State's intent to seek life without parole, which had not been timely afforded to Hammersla before his second trial, became the bête noire of the case. The trial court concluded that the State was not required to refile notice, but the Court of Special Appeals reversed and determined that the notice of intent had to have been timely presented to Hammersla because the retrial

---

[16] Section 3-101(c) of the Criminal Procedure Article defines "court" as "a court that has criminal jurisdiction." Thus, the circuit court in which a case is retried with the same defendant is the "court" for purposes of Title 3 of the Criminal Procedure Article (today's case).

[17] Section 2–203 of the Criminal Law Article, Maryland Code (2002) provided:
> A defendant found guilty of murder in the first degree may be sentenced to imprisonment for life without the possibility of parole only if: (1) at least 30 days before trial, the State gave written notice to the defendant of the State's intention to seek a sentence of imprisonment for life without the possibility of parole; and (2) the sentence of imprisonment for life without the possibility of parole is imposed in accordance with § 2–304 of this title.

34

"'wiped the slate clean,' and the case began anew procedurally." *Id.* at 313, 965 A.2d at 923.

Similarly in *Harrod*, the State had provided Harrod with notice of its intent to seek admission of a chemist's report, as required by statute, but did not timely afford notice after a new trial was ordered.[18] We determined that "the grant of a new trial after a mistrial creates a 'tabula rasa,'" and the "mistrial revived the State's obligation." *Harrod*, 423 Md. at 36, 31 A.3d at 180.

In essence what the State is alleging is that what is "sauce for the goose is sauce for the gander" because the State's responsibilities in the latter two cases were revived before retrial, such that Sibug would be required to raise competency afresh before his 2008 trial. The State erroneously assumes that its procedural obligations in *Hammersla* and *Harrod* are on the same footing with respect to raising the issue of competency.

---

[18] Section 10-1003 of the Courts and Judicial Proceedings Article provided:

> (a) (1) In a criminal proceeding, the prosecution shall, upon written demand of a defendant filed in the proceedings at least 5 days prior to a trial in the proceeding, require the presence of the chemist, analyst, or any person in the chain of custody as a prosecution witness. (2) The provisions of §§ 10-1001 and 10-1002 of this part concerning prima facie evidence do not apply to the testimony of that witness. (3) The provisions of §§ 10-1001 and 10-1002 of this part are applicable in a criminal proceeding only when a copy of the report or statement to be introduced is mailed, delivered, or made available to counsel for the defendant or to the defendant personally when the defendant is not represented by counsel, at least 10 days prior to the introduction of the report or statement at trial. (b) Nothing contained in this part shall prevent the defendant from summoning a witness mentioned in this part as a witness for the defense.

Md. Code Ann., § 10–1003 of the Courts and Judicial Proceedings Article (1973, 2006 Repl. Vol.).

The State's equation is not sound. As recently as *Gregg* we recognized the constitutional underpinnings of the issue of competency and opined that the obligation with respect to a determination of competency rests with the court and not the defendant. 377 Md. at 526, 833 A.2d at 1047. In *Gregg* we stated:

> A competency hearing and determination must meet the due process requirements under the Fourteenth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights. *See Medina*, 505 U.S. at 439, 112 S.Ct. at 2574, 120 L.Ed.2d at 359 (stating that "it is well established that the Due Process Clause of the Fourteenth Amendment [to the United States Constitution] prohibits the criminal prosecution of a defendant who is not competent to stand trial"); *Drope*, 420 U.S. at 171, 95 S.Ct. at 903, 43 L.Ed.2d at 113 (noting the long-standing belief that a person who lacks the capacity to understand the nature and object of the proceedings against him may not stand trial); *Pate*, 383 U.S. at 378, 86 S.Ct. at 838, 15 L.Ed.2d at 818 (concluding that "the conviction of an accused person while he is legally incompetent violates due process"); *Trimble v. State*, 321 Md. 248, 254, 582 A.2d 794, 797 (1990) (stating that "[i]f a state fails to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent, it denies him due process"); *Jones v. State*, 280 Md. 282, 290, 372 A.2d 1064, 1068 (1977) (finding that the failure to invoke proper statutory procedures designed to insure that the defendant not be tried if incompetent may result in the denial of a fair trial).

*Id.* at 537-38, 833 A.2d at 1053 (internal footnotes omitted). As a result, for the purposes of competency at least, a retrial did not renew Sibug's responsibility to raise the issue of competency prior to trial.

The first certiorari question now looms before us, that being whether after having been adjudicated incompetent in the same case in the same court, Sibug needed to have been adjudged competent under Section 3-104 of the Criminal Procedure Article,

Maryland Code (2001, 2008 Repl. Vol.).[19] Sibug argues that the trial court erred in not determining that Sibug had been restored to competency before he was tried and posits that a "presumption of incompetency" arose from the earlier adjudication.

The State, alternatively, contends that it is presumptive that a defendant is competent to stand trial; that "Sibug did not generate or present to the trial court an issue as to his competence"; that "the Court of Special Appeals correctly concluded that it was not incumbent upon the trial court to have, *sua sponte*, found Sibug to be competent before he was tried," and that there was no need for a judicial determination because of "numerous proceedings conducted after [Sibug] was determined to be competent to stand trial, including proceedings initiated by Sibug to secure a second trial, and the absence of any claim of incompetence by Sibug or his counsel at any of those proceedings". The State also argues that, "[u]pon receiving the opinion of DHMH in August, 2004, that Sibug was competent to stand trial, and in thereafter repeatedly scheduling and then calling Sibug's case for trial without opposition, the court necessarily determined that Sibug was competent to stand trial." Additionally, the State argues that "[i]n *Wood v.*

---

[19] Under Chapter 353 of the Maryland Laws of 2006, the court now is required to hold a hearing at least annually and also after receiving a report with new facts from the Department after a defendant is committed:

> [T]o determine whether the defendant continues to meet the criteria for commitment set forth in subsection (b) of this section, the court shall hold a hearing: (i) every year from the date of commitment; (ii) within 30 days after the filing of a motion by the State's Attorney or counsel for the defendant setting forth new facts or circumstances relevant to the determination; and (iii) within 30 days after receiving a report from the Health Department stating opinions, facts, or circumstances that have not been previously presented to the court and are relevant to the determination.

37

*State*, [436 Md. 276, 81 A.3d 427 (2013)] this Court addressed a claim identical to that made by Sibug: that the trial court committed a procedural error by failing to make a competency determination."

We agree with Sibug, but we need not go so far as to embrace that a presumption of incompetency existed as a result of the first adjudication.[20] Rather, it is sufficient on the facts before us that the tenets of Section 3-104 were engaged during the retrial in

_____

[20] Sibug relies on various cases that embrace a presumption of incompetency. In *Alexander v. State*, 380 So.2d 1188 (Fla. Dist. Ct. App. 1980), the defendant was convicted for "larceny of a dwelling while armed with a knife." *Id.* at 1189. Alexander alleged that his conviction should be set aside because he had previously been adjudicated incompetent, his competency had never been restored and there was no hearing to determine competency. *Id.* The court reasoned that "[i]t has long been the law of this state, as well as at common law, that a person adjudged to be insane is presumed to continue insane until it is shown that his sanity has returned." *Id.* The court asserted, without objection from the State, that a similar presumption "follows an adjudication of incompetency" and it is the State's "obligation to rebut the same". *Id.* at 1190. The court concluded that Alexander could not be adjudicated from incompetent to competent without a hearing. *Id.* Neither our statutory nor common law compels the same conclusion.

In *United States v. Tesfa*, 404 F.Supp. 1259, 1267 (E.D. Pa. 1975) *aff'd sub nom. United States v. Green*, 544 F.2d 138 (3d Cir. 1976), a federal district court judge relied on a presumption of continued incompetency in his determination that a defendant was competent. Also, in *State v. Bradley*, 433 P.2d 273, 278 (Ariz. 1967), the Supreme Court of Arizona merely stated, without citation to authority, that a "prior adjudication of mental incompetency gives rise to a rebuttable presumption of continued incompetency." In *State v. Coley*, 286 P.3d 712, 717 (Wash. Ct. App. 2012), the holding regarding a presumption of incompetency was reversed last year when the Washington Supreme Court declined to adopt a presumption of incompetency. 326 P.3d 702, 710 (Wash. 2014) *cert. denied*, 135 S. Ct. 1444, 191 L. Ed. 2d 399 (2015).

Finally Sibug cites *Schaffer v. State*, 583 S.W.2d 627, 630 (Tex. Crim. App. 1979), in support of our adopting a presumption of incompetency. The Texas court, relying on the general rule that a person found insane is presumed to remain so until found otherwise, decided that "once found to be so incompetent, he is presumed to be incompetent to stand trial until such time as it has been determined in accordance with the law that he is competent to stand trial." *Id.* citing *Hefley v. State*, 480 S.W.2d 810, 814 (Tex. Civ. App. 1972).

2008, requiring a determination of competency, because Sibug had been adjudicated incompetent in the same case in the same court. Cases from our sister states and federal courts assist us in our analysis.

In *Clark v. State*, 388 P.2d 816, 818 (Alaska 1964), a case close to point and decided even before the Supreme Court decided *Pate*, the trial court determined Clark to be incompetent to stand trial and had ordered him committed "'until released and certified by competent authority to have sufficient soundness of mind to appreciate the charges against him and to enable him to make a proper defense.'"[21] A month later, a

---

[21] The relevant provisions of the "Alaska Code, 104, SLA 1960," provided:

Section 1. Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the Attorney General or the District Attorney has reasonable cause to believe that a person charged with an offense against the State of Alaska may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such reasonable period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto. No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding. A finding by

(continued . . . )

letter from the psychiatrists who had evaluated him opined that Clark "was competent to make a proper defense." *Id.* Clark's case was set for trial; he was convicted without having a hearing and a judicial determination of competence. *Id.* at 817-19. On appeal, Clark alleged that the trial court erred in permitting him to be tried without a hearing and judicial determination that he was competent. *Id.* at 819.

In determining that Clark was entitled to a new trial, the Alaska Supreme Court interpreted the meaning of the phrase in Alaska law which stated that, "when an accused person is judicially determined to be mentally incompetent, the court may order him to be institutionalized 'until the accused shall be mentally competent to stand trial.'" *Id.* at 819 citing Section 2 of chapter 104, SLA 1960. In interpreting the statute, the Alaska court ultimately determined that "the [trial] court erred in permitting Clark to be tried on October 15, 1962, without first affording him a second hearing as to his competency to stand trial." *Id.* at 821. In so doing, the court noted that the provisions under investigation

---

( . . . continued)

> the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury.
> Sec. 2. Whenever the trial court shall determine in accordance with Section 1 of this Act that an accused is or was mentally incompetent, the court may commit the accused to the custody of the Commissioner of Health and Welfare or his authorized representative, until the accused shall be mentally competent to stand trial or until the pending charges against him are disposed of according to law.

*Id.* at 817 n.1.

40

were "identical with those contained in sections 4244 and 4246 of title 18 U.S.C.A. (1951)"[22] and relied upon federal cases to support its conclusion:

> That court in the leading case of Gunther v. United States [23] held that, after an accused had been judicially determined incompetent to stand trial

---

[22] Section 4244 of title 18 U.S.C.A. (1951) provided, in pertinent part:
> Whenever after arrest and prior to the imposition of sentence * * * the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused * * * to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. * * * If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto. * * *

Section 4246 of title 18 U.S.C.A. (1951) provided, in pertinent part:
> Whenever the trial court shall determine in accordance with sections 4244 and 4245 of this title that an accused is or was mentally incompetent, the court may commit the accused to the custody of the Attorney General or his authorized representative, until the accused shall be mentally competent to stand trial or until the pending charges against him are disposed of according to law.

[23] 215 F.2d 493 (D.C. Cir. 1954). A year after *Clark* was decided, the Court of Appeals for the District of Columbia revisited *Gunther* in *Whalem v. United States*, 346 F.2d 812, 815 (D.C. Cir. 1965) *overruled on other grounds by United States v. Marble*, 940 F.2d 1543 (D.C. Cir. 1991), in light of the subsequent statutory amendment of D.C. Code § 24-301 in 1955. The court stated that "[t]his was, of course, the statute Congress adopted for the explicit purpose of altering our holding in *Gunther*." *Id.* at 815. Because of the change in the statutory climate after *Gunther* was decided the court opined that a judicial determination of competency in *Whalem* was not necessary: "In enacting the 1955 amendments to § 301 Congress, as we read the statute, *specifically overruled* that much of the *Gunther* and *Contee* cases which held that an accused could not be ordered to trial

(continued . . . )

( . . . continued)
on the basis of the certification of the accused's competency to stand trial by the superintendent of the mental institution wherein the accused has been examined." *Id.* at 816.

In *Whalem* the defendant had been civilly committed to a psychiatric hospital and committed several crimes while on "convalescent leave" from the hospital. *Id.* at 814. After his arrest, Whalem filed a motion for a mental examination, which was granted, and the reporting psychiatrist opined that Whalem was competent. *Id.* Whalem then moved for a further evaluation, which was granted, and the second report also stated that he was competent. *Id.* After receiving the reports he did not object or request a hearing. *Id.* On appeal, Whalem argued that the court erred in not holding a hearing to determine his competency to stand trial. *Id.*

The court noted that the statute was silent on what a court must do after reports generated as the result of a court order for a mental examination state the defendant is competent to stand trial. *Id.* The court reasoned that if the report opines that the defendant is not competent to stand trial, then, under Section 24-301(a) of the D.C. Code, "'[s]uch report shall be sufficient to authorize the court to commit by order the accused to a hospital for the mentally ill unless the accused or the Government objects, in which event, the court, after hearing without a jury, shall make a judicial determination of the competency of the accused to stand trial.'" *Id.* at 814-15. Furthermore, if the defendant is then committed, Section 24-301(b) of the D.C. Code then addressed what a court must do if the superintendent of the hospital states that the defendant has been restored to competency:

> The superintendent shall certify such fact to the clerk of the court * * * and such certification shall be sufficient to authorize the court to enter an order thereon adjudicating him to be competent to stand trial, unless the accused or the Government objects, in which event, the court, after hearing without a jury, shall make a judicial determination of the competency of the accused to stand trial.

*Id.* at 815. The court interpreted these two statutory provisions together to mean that "whenever the court receives a certification of incompetency or a certification of restoration of competency and there is no objection by either the accused or the Government, the court may, in the one case, forthwith commit the accused to a mental hospital and, in the other, immediately proceed with the trial" but concluded that, "Congress intended that a certification of competency following a § 301(a) referral should be sufficient to authorize the court in its discretion to proceed with the trial *unless* the accused or the Government objects, in which case a hearing must be held to determine competency." *Id.* The court further distinguished the case from *Gunther* because, the holding in *Gunther* was that "a judicial determination of competency based on a hearing was required, in view of an earlier judicial finding, after a hearing, of the

(continued . . . )

under 18 U.S.C.A. §§ 4244 and 4246, it was error for the trial court to proceed with his trial without other preliminary than the certificate of the superintendent of the mental hospital to which he had been committed that the accused had recovered his reason, was again of sound mind, and had been discharged from treatment. Explained the court:

Section 4244 describes the motion initiating proceedings as 'a motion for a *judicial determination* of * * * mental competency of the accused * * *.' A judicial finding of mental *incompetency*, far from discharging the court's duty in response to such a motion, creates a greater necessity than previously existed for a judicial determination of competency.

If the question were merely whether a mentally incompetent person should be discharged from further hospitalization, it might well be left to the sole judgment of the hospital officials. Indeed, in related sections where that is the question, Congress has entrusted it to administrative officials. But the question here is not merely whether one who has previously been adjudged incompetent shall be discharged from further hospitalization, but, rather, whether such a person is competent to stand trial; in the language of the statute 'to understand the proceedings against him or [and] properly to assist in his own defense'. While, of course, expert psychiatric judgment is relevant on this question, it cannot be controlling. Resolution of this issue requires not only a clinical psychiatric judgment but also a judgment based upon a knowledge of criminal trial proceedings that is peculiarly within the competence of the trial judge. That Congress recognized this is borne out by the fact that § 4246, providing for the commitment of persons found incompetent under § 4244, withholds the blanket authority to terminate custody which Congress has given to administrative officials where capacity to stand trial is not an issue.

Four months later, November 24, 1954, the same court expressed its opinion in the case of Kelley v. United States[24] as to what constitutes a sufficient motion for a judicial determination of competency of an accused to stand trial after a prior determination of his incompetency and order of

---

( . . . continued)
accused's incompetency to stand trial" and "in this case there was no prior adjudication of incompetency." *Id.* at 817.

[24] 221 F.2d 822 (D.C Cir. 1954).

commitment for treatment. Kelley, who had been indicted for robbery and pleaded not guilty, was found not competent to stand trial after a court hearing pursuant to 18 U.S.C.A. § 4244 and committed to St. Elizabeths Hospital. On February 13, 1953, the superintendent of the hospital certified that Kelly had recovered his reason, was of sound mind and had been discharged that day.

Eight months later the case was called for trial. Kelley's counsel then asked the court, presided over by another judge, to order a re-examination, pointing out to the court the prior commitment and referring to the record from St. Elizabeths of Kelley's return to sanity and discharge as not conclusive. Counsel also informed the court that he had talked to Kelley for about twenty minutes and felt that he was not prepared to go to trial and that the two doctors who had testified at the prior hearing 'will testify even now that the man is insane.' The court denied the motion and the case went to trial. The court of appeals ruled that the motion was well-founded and should have been granted. In so ruling, the court called attention to the fact that in the Gunther case it had held that even in the absence of any motion a judicial determination of mental competency to stand trial is required when, in circumstances like those in Kelley's case, there has been an earlier judicial determination of incompetency and no subsequent judicial determination of competency.

Next in line appears the case of Taylor v. United States,[25] in which the court of appeals epitomized the rule first announced in Gunther as follows: "When an accused person has been judicially found incompetent to stand trial, it is erroneous to try him until it has been judicially determined that he is competent to stand trial. * * *"

Lastly, in Blunt v. United States[26] the Court of Appeals for the District of Columbia Circuit went a step further in holding that a judicial determination, still outstanding at the time of an accused's trial and conviction, that he was incompetent to stand trial, applies equally to every step involved in his prosecution of an appeal from the conviction. The particular circumstances in that case were that Blunt was in prison and without counsel from October 30, 1953, the day he was sentenced, until March 9, 1956, when the appellate court granted his motion to appeal in forma pauperis and appointed counsel for him. Although the Government

---

[25] 222 F.2d 398 (D.C. Cir. 1955).

[26] 244 F.2d 355 (D.C. Cir. 1957).

argued that the appellate court had no jurisdiction to hear the matter because Blunt had abandoned his appeal by doing nothing for more than two years towards pursuing the appeal, the court concluded for reasons explained in its opinion that he had made timely efforts to pursue his appeal. Said the court in a marginal footnote:

> We need not go so far as to say that any actual notice to him [that the trial court had denied his request that he be furnished a stenographic transcript at Government expense] could have had no legal effect. For present purposes, it is enough to say that until there has been a judicial determination of restored competency, one who has been judicially determined to be incompetent is-at least prima facie-legally incapable of making the choices involved in such processes as abandonment, waiver or consent. * * *

We find the foregoing federal decisions to be based upon sound reasoning and regard them as persuasive because they construe statutes identical with those of Alaska on the question here presented. We conclude that the court erred in permitting Clark to be tried on October 15, 1962, without first affording him a second hearing as to his competency to stand trial.

*Id.* at 819-21 (internal footnotes omitted).[27]

---

[27] In cases that held to the contrary before *Pate*, the statutory sections subject to interpretation permitted restoration of competency to be determined by administrative personnel in psychiatric hospitals. In *State v. Cox*, 396 P.2d 326 (Kan. 1964), the Kansas Supreme Court interpreted G.S. 1949, 62-1531, which provided that:

> Whenever any person under indictment or information, and before or during the trial thereon, and before verdict is rendered, shall be found by the court in which such indictment or information is filed, or by a commission or another jury empaneled for the purpose of trying such question, to be insane, an idiot or an imbecile and unable to comprehend his position, and to make his defense, the court shall forthwith commit him to the state hospital for the dangerous insane for safekeeping and treatment; and such person shall be received and cared for at the said institution until he shall recover, when he shall be returned to the court from which he was received to be placed on trial upon said indictment or information. If in the judgment of the medical superintendent of the state hospital for the dangerous insane, any person committed under this section is not in such condition as warrants his return to the court but is in a condition to be paroled under supervision, the superintendent shall report to the department

(continued . . . )

45

The Alaska statute in *Clark* was similar to the federal statute, which described "a *judicial determination* of such competency" and a hearing where the court was required to "make a finding with respect thereto" 18 U.S.C.A. §4244 (1951) (emphasis added); *see also* Alaska Code, Chapter 104, SLA 1960. Our statute which provides that "the *court* shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial," Md. Code Ann., Crim. Pro. § 3-104(a) (emphasis added), is also similar. If anything, our statute has greater clarity in the need for a judicial

---

( . . . continued)
> and the committing court his reasons for his judgment and the plans which have been made for such parole. If the court does not file objection to the parole within sixty days of the date of the report, the superintendent may, with the approval of the department, parole him to a legal guardian or other person, subject to the rules and regulations of the department.

*State v. Lammers*, 237 P.2d 410, 413 (1951). The court determined that the trial court "complied with the provisions of G.S. 1949, 62-1531" when the superintendent of the hospital where Cox was committed "advised the court that defendant had recovered to the point where he was able to understand his position and to be of assistance in his defense, and it was recommended that he be returned to the court for trial." *Cox*, 396 P.2d at 328.

A similar conclusion was reached in *McNaron v. State*, 104 So. 339, 340 (Ala. Ct. App. 1925) in which the court interpreted the Alabama Code of 1923, Section 4575, which stated in pertinent part "If [the jury] find that he is insane at that time, the court shall make an order committing him to an insane hospital, where he must remain until he is restored to his right mind. When the superintendent of the hospital shall be of opinion that such person is so restored he shall forthwith, in writing, inform the judge and sheriff of such court of the fact, whereupon such person must be remanded to prison on an order of such judge, and the criminal proceedings resumed." The court in that case determined that, "[w]hen the defendant voluntarily left the custody of the hospital authorities and returned to the sheriff, and the superintendent of the hospital notified the judge by letter that the defendant was no longer insane, although such letter was not couched in formal terms, the bar to further proceedings was thereby removed, and the court could legally proceed with the trial, whether the time elapsing from date of commitment was one day or 10 years." *Id.* The court reasoned that, "the defendant being already in the custody of the sheriff, no formal order of remandment to prison by the judge was essential to a continuance of prosecution." *Id.*

determination of competency, such that, we already have stated that "it is strikingly obvious that the Legislature envisioned a need for a Court determination of competency." *Roberts*, 361 Md. at 363, 761 A.2d at 894-95.

In 1999, the trial court found Sibug incompetent. Subsequently, psychiatrists wrote that he was competent, but no court ever found him competent again until after his 2008 trial. Because the responsibility for a competence determination lies with the court, Sibug was still under the previous finding of incompetence at the time of his 2008 trial.

A determination made by a psychiatrist is not sufficient; delegation by the court of its constitutional responsibility is not acceptable. *See In re: Mark M.*, 365 Md. 687, 782 A.2d 332 (2001) ("While determinations concerning visitation are generally within the sound discretion of the trial court, not to be disturbed unless there has been a clear abuse of discretion, where a trial court's order constitutes an improper delegation of judicial authority to a non-judicial agency or person, the trial court has committed an error of law".). Therefore, there needed to be a subsequent adjudication of competency once Sibug was determined to be incompetent in the same case, in the same court.

The State, however, argues that there was no need for a judicial determination of competency "[i]n light of the numerous proceedings conducted after [Sibug] was determined to be competent to stand trial". The State also asserts, in the alternative, that the continued proceedings since 2004 leads to the conclusion that "the court necessarily determined that Sibug was competent to stand trial." Competence to stand trial is dependent upon when a proceeding occurs and other factors, such as medication

47

administration, among others, which necessitates an explicit judicial determination when the issue is in doubt.

The State further urges that our decision in *Wood*, 436 Md. at 276, 81 A.3d at 427, undercuts the necessity of a judicial determination of competency. In that case, Wood's counsel had requested, pretrial, an evaluation of competence, which the court granted, but Wood refused to meet with the evaluating doctor. At a subsequent pretrial hearing, when Wood's attorney withdrew his request for the competency evaluation, the trial court then considered the competency issue moot; Wood was convicted.

Before us, Wood argued he should not have been allowed to withdraw his request for a competency evaluation and that the trial court should have made a competency determination on the record. We disagreed. We determined that, "[t]he withdrawal of Petitioner's request for an evaluation, under the circumstances, rendered the issue of competency moot" in part because the trial judge could give "credence to the fact that Petitioner's counsel ultimately withdrew his request for a competency evaluation." *Id.* at 290, 81 A.3d at 435. We also held that though the judge had a *sua sponte* duty to evaluate Wood's competency "if there was a bona fide doubt created by evidence on the record" there was not sufficient evidence on the record to establish such a duty. *Id.* at 291, 81 A.3d at 436.

*Wood*, contrary to what the State asserts, does not support its contention that a determination of competency in the present case was not required. *Wood*, rather, supports our decision in the present case that not only was a competency determination required, but that the judge clearly erred in determining at sentencing that Sibug was competent.

48

Unlike in *Wood*, Sibug's testimony at trial upon which the trial court relied in making its post hoc evaluation of Sibug's competency, clearly reflected the same belief system on Sibug's part that led the Department to repeatedly opine that Sibug was incompetent, prior to the time he was forcibly or voluntarily medicated.

At trial, Sibug described his children from his previous marriage as "wicked" as opposed to his other "righteous" children, and further described them as "goat like human being" and "the Devil." He further testified that, after praying to God for assistance, God spoke to him and he did "just like what Abraham did in Genesis 22:1-18. Abraham used a dagger but God tested his faith, and it make him subdued to his Father." Sibug answered questions using Biblical references rather than responding to the questions, to the point that Sibug's counsel requested to lead:

> He has never told me what has done with the gun. He has been dancing around this issue for a long time. He needs to tell them that he did take the gun out and what he did with that gun when he took it out; otherwise, Your Honor, we're going to hear about Jacob, Isaac, Saul and down the line.

Sibug's testimony at trial mirrors what Sibug had stated to the Department when on numerous occasions the Department had opined that he was incompetent. Additionally, the letter that Sibug tendered to the trial court at sentencing contained much of the same references that heretofore had fueled a determination of incompetency. In the letter, Sibug referred to his son as "the Devil" and maintained that he "was maliciously persecuted and convicted as a Criminal in Man's law by obeying Jehovah God's law."

In 1999 Sibug told his evaluators that "My defense would be based on righteousness and the right to practice godly personal values." Based on Sibug's behavior

and responses, the Department sent a letter to the court stating that while Sibug had "a factual understanding of the court system" he suffered from "religious delusions" and could not "separate man-made law from 'God's moral law.'" As a result, he intended "to use a legal defense based upon Biblical scripture and 'God's truth' rather than developing evidence to contest the facts of the case." Again, the same beliefs led the Department to opine in 1999 that Sibug was not competent to stand trial:

> The characterization of the defendant's religious beliefs as delusional does not indicate that the beliefs themselves are false; but rather, it indicates that the defendant's attribution of religion to his situation is false. His beliefs reflect both paranoia and grandiosity. The defendant believes that his legal case is more than a criminal prosecution. He is convinced that his legal case involves the eternal struggle between the forces of Satan and God. He believes that his case is "God's case."

After the evaluation was sent to the court, the Circuit Court determined that Sibug was not competent to stand trial.

Additionally, in 2000, the Department opined that Sibug's condition "deteriorated" based upon the fact that "[w]hen asked about his role in the alleged offenses, he answered with a litany of Biblical scriptures. When directed to answer in his own words, he became agitated and spewed forth more scripture." A later report from the Department in 2001 further indicated, "[e]ven though religious reasons for making decisions in life are valid, it is important to note that, in this case, Mr. Sibug's religious arguments are fueled by his underlying delusional disorder. Because his decision-making regarding his case was firmly rooted within his fixed, non-bizarre delusion it was impaired."

50

Juxtaposing these recitations of Sibug's belief system with those that led to prior evaluations of incompetency yields to the conclusion that the judge clearly erred in finding Sibug competent to stand trial. While Sibug may not have exhibited the same constellation of behaviors as exhibited by Trimble in *Trimble v. State*, 321 Md. 248, 582 A.2d 794 (1990), nor by Thanos in *Thanos v. State*, 330 Md. 77, 622 A.2d 727 (1993) (*Thanos I*); *Thanos v. State*, 330 Md. 576, 625 A.2d 932 (1993) (*Thanos II*), Sibug's repeated beliefs should have flagged a concern about incompetency such that the judges determination at sentencing that Sibug was competent was clear error.

In conclusion, under Section 3-104 of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl. Vol), the court was required to make a determination upon retrial whether Sibug was competent to stand trial and clearly erred in determining at sentencing that Sibug was competent.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL WHEN COMPETENCY IS FOUND; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY BALTIMORE COUNTY.**

Circuit Court for Baltimore County
Case Nos. 03-K-99-000501 & 03-K-99-001662

Argued: September 2, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 2

September Term, 2015

_____

MARIO SIBUG

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T. (Retired,
Specially Assigned),

JJ.

_____

Dissenting Opinion by Watts, J., which Adkins,
J., joins

_____

Filed: November 25, 2015

Respectfully, I dissent. This case presents unique circumstances and gives rise to a holding that would not be implicated in most cases involving competency challenges. In most instances, a defendant raises an issue of competency, and, if necessary, the trial court orders an evaluation and rules on the matter, and nothing more need be said.

Here, however, the issue of competency was not raised during Mario Sibug ("Sibug")'s, Petitioner's, 2008 trial. I would affirm the judgment of the Court of Special Appeals based on the thorough, well-reasoned, and, most importantly, legally sound opinion of Chief Judge Peter B. Krauser, writing on behalf of that Court. Put simply, I agree with the Court of Special Appeals that

> the issue of Sibug's competence to stand trial was never before [the Circuit Court for Baltimore County ("the circuit court")] at his [2008] trial[,] as it was not raised by counsel, the [circuit] court, or Sibug's courtroom behavior. As such, the circuit court did not err in determining whether Sibug was competent because this issue was not before it.

Sibug v. State, 219 Md. App. 358, 374, 100 A.3d 1245, 1254 (2014).

The Majority frames the issue alternatively: "[W]e must address the quagmire that results from a defendant in a criminal case having been adjudicated incompetent, then eight years later being tried and convicted in the same case without having been adjudged competent to stand trial[,]" Maj. Slip Op. at 1 (footnote omitted), and "The first certiorari question now looms before us, that being whether[,] after having been adjudicated incompetent in the same case in the same court, Sibug needed to have been adjudged competent under Section 3-104 of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl. Vol.) [("CP"),]" Maj. Slip Op. at 36-37 (footnote omitted). In framing the issue and disagreeing with the persuasive opinion of the Court of Special Appeals, the Majority

accords little to no significance to critical facts—namely, in 2004, Sibug entered a plea of not guilty on an agreed statement of facts as to one count of second-degree assault, and was found guilty; and, at the time, Sibug did not raise any issue as to competency. Sibug was sentenced to four-and-a-half years of imprisonment with credit for time served, and, as a result, was immediately released from custody. Thereafter, Sibug did not file a motion for new trial, appeal, or raise any collateral challenge to the conviction on the ground that he had been incompetent to stand trial. Instead, Sibug filed a petition for a writ of error coram nobis in which he alleged that his trial counsel had failed to advise him of the immigration consequences of his conviction for second-degree assault. And, in 2005, the circuit court granted the petition for a writ of error coram nobis and granted Sibug a new trial.

In the intervening time period, for over three years, before his September 10, 2008 trial, Siburg never contended, pled, or raised in any manner that he was not competent to stand trial. In short, the issue of competency was not before the circuit court at Sibug's 2008 trial, and was never before the circuit court until Sibug raised the issue in a motion for a new trial prior to sentencing. In raising the issue, Sibug's counsel apparently did not assert that the issue remained ripe, as, in the motion for a new trial, Sibug's counsel stated that, "in retrospect[,]" he then believed that Sibug had not been competent to stand trial. The circuit court properly denied the after-the-fact motion and found that Sibug had indeed been competent to stand trial.

The Court of Special Appeals correctly stated that there are three ways in which a trial court's duty to determine a criminal defendant's competence may be triggered—"upon the motion of the defendant, upon the motion of the defendant's counsel, or upon a *sua*

- 2 -

*sponte* determination by the [trial] court that the defendant may not be competent to stand trial[,]" Sibug, 219 Md. App. at 369, 100 A.3d at 1251 (citation and internal quotation marks omitted)—and that none of these occurred in this case before or during trial, id. at 371-72, 100 A.3d at 1253. To adopt the Majority's reasoning in this case is to conclude that an allegation of incompetence raised in 1999, not pursued in a not guilty agreed statement of facts and sentencing proceeding in 2004, nor in a petition for a writ of error coram nobis and the granting of a new trial on another ground in 2005, somehow remained ripe under CP §§ 3-101 to 3-123, and that the circuit court was required to adjudicate the matter, without any request by Sibug, before his 2008 trial. In complete agreement with the Court of Special Appeals, for reasons upon which I cannot much improve, I would not so conclude.[1] As stated by the Court of Special Appeals in Sibug, 219 Md. App. at 370, 100 A.3d at 1252:

> Given that the reversal of a conviction "with an order for a new trial, 'wipe[s] the slate clean,' and the case [begins] anew procedurally," returning the case to the stage where "any pretrial motions could be filed and resolved," *Hammersla v. State*, 184 Md. App. 295, 313-14, 965 A.2d 912[, 923, cert. denied, 409 Md. 49, 972 A.2d 862] (2009), it was incumbent upon Sibug, or his counsel, to raise the issue of incompetency anew. *Cf. Harrod v. State*, 423 Md. 24, 34-36, 31 A.3d 173[, 179-80] (2011) (explaining that the grant of a mistrial, like the grant of a new trial, "requires the litigants to observe pretrial procedures once again," including the State's obligation to give notice of its intent to introduce a chemist's report[,] even though the same report had been introduced at the first trial); *Marshall v. State*, 213 Md. App. 532, 550-54, 74 A.3d 831[, 841-43, cert. denied, 436 Md. 329, 81 A.3d 458] (2013) (concluding that the grant of a new trial "effectively wipe[d] out the prior proceedings" and required the defendant to allege at his second trial that the Maryland gang statute was unconstitutional[,] even though he had

---

[1]Likewise, I would conclude that the circuit court did not err in holding a hearing on the issue of Sibug's competence after the trial's conclusion, even though the circuit court was not required to do so.

raised that same issue prior to his first trial).

(Some alterations in original).

As to the circuit court's obligation to raise the issue of competency based on Sibug's conduct at trial, the circuit court did not err in refraining from independently raising whether Sibug was competent to stand trial; it is undisputed that neither Sibug nor his counsel alleged incompetence to stand trial, and the record does not demonstrate that Sibug appeared to be incompetent to stand trial. Nothing in the record indicates that Sibug failed to observe proper courtroom behavior (*e.g.*, by standing up, shouting, or moving around inappropriately). To the contrary, Sibug acted properly at trial; he elected to testify, and answered questions from his counsel and the prosecutor. It is accurate that, as noted by the Majority, Sibug referenced the Bible several times while testifying, prompting his counsel to ask the circuit court for permission to lead Sibug. See Maj. Slip Op. at 49. That said, Sibug's counsel eventually elicited the testimony that he had been seeking (*i.e.*, that Sibug displayed a gun to his children, but did not point it at them), and Sibug's references to the Bible in no way demonstrated that Sibug was "not able: (1) to understand the nature or object of the proceeding; or (2) to assist in [his] defense." CP § 3-101(f) (paragraph breaks omitted). On this record, I would not conclude that the circuit court erred in refraining from raising Sibug's competency *sua sponte*.

For the above reasons, respectfully, I dissent, as I would affirm the judgment of the Court of Special Appeals.

Judge Adkins has authorized me to state that she joins in this opinion.

- 4 -